## Nos. 24-1380, 1480, 1493, 1516

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE EIGHTH CIRCUIT

ZIMMER RADIO OF MID-MISSOURI INC., ET AL.

*Petitioners*

ABC TELEVISION AFFILIATES ASSOCIATION, ET AL.

*Intervenors*

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.

*Respondents*

NCTA- THE INTERNET & TELEVISION ASSOCIATION, ET AL.

*Intervenors*

On Petitions for Review of an Order of the
Federal Communications Commission

## OPENING BRIEF OF PETITIONERS

Barbara A. Smith
BCLP LLP
3600 One Metropolitan Square
211 N. Broadway
Saint Louis, Mo 63102-2186
(314) 259-2367
barbara.smith@bclplaw.com

*Counsel for Petitioner Zimmer
Radio of Mid-Missouri, Inc.*

Helgi C. Walker
   *Counsel of Record*
Andrew G.I. Kilberg
Cameron J.E. Pritchett
Hadhy Ayaz
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioner National Association
of Broadcasters*

*Additional counsel on inside cover*

Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
ajohnson@gibsondunn.com

*Counsel for Petitioner Nexstar Media Group, Inc.*

Eric D. Stolze
Stephen B. Kinnaird
PAUL HASTINGS LLP
1170 Peachtree Street, N.E.
Suite 100
Atlanta, GA 30309
(404) 815-2315
ericstolze@paulhastings.com

*Counsel for Petitioners Beasley Group, LLC* and *Tri-State Communications, Inc.*

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street, S.E.
Washington, D.C. 20003
Telephone: (202) 429-5430
rkaplan@nab.org

*Counsel for Petitioner National Association of Broadcasters*

**SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT**

These consolidated petitions challenge the Federal Communications Commission's broadcast ownership restrictions, including its decision to increase the regulatory burden on industry in what Congress intended to be a deregulatory exercise: the Commission's periodic review of its broadcast ownership rules. The Local Television and Radio Rules retain and even tighten decades-old restrictions on which—and how many—television and radio stations broadcasters may own in a particular geographic market. The rules are premised on the notion that broadcasters could exert disproportionate influence by shaping news and entertainment options. But that idea is a relic from a bygone era—before the emergence of the Internet, smart phones, social media, and streaming. In reality, broadcasters today struggle to keep pace with rapidly proliferating audio and video platforms that are steadily taking audience share and advertising dollars. Instead of making it harder for broadcasters to compete, the Commission should have modernized its outdated rules because they are no longer justified.

Given the significance of the Commission's rules, the size of the regulatory record, and the number of parties involved, Petitioners respectfully submit that oral argument would be beneficial. An allocation of 30 minutes per side would be adequate to address the issues, incorporating 10 minutes for each side's Intervenors.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Petitioners make the following disclosures:

NAB is a nonprofit, incorporated association of radio and television stations. It has no parent company, and has not issued any shares or debt securities to the public; thus no publicly held company owns 10% or more of its stock. As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, the coalition is a trade association for purposes of Eighth Circuit Rule 26.1.

Zimmer Radio is a small broadcasting company with 13 FCC-licensed commercial radio stations serving local audiences and communities in mid-Missouri. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Beasley Media Group, LLC is a subsidiary of Beasley Broadcast Group, Inc., and 10% or more of Beasley Media Group, LLC's stock is owned by Beasley Broadcast Group, Inc. Beasley Broadcast Group, Inc. is a publicly held corporation. Petitioner Tri-State Communications, Inc. is not a publicly traded company or corporation, has no parent company or corporation, and no publicly held company or corporation owns 10% or more of Tri-State Communications, Inc.'s stock.

Nexstar Media Group, Inc. is a publicly held company. No publicly held corporation owns 10% or more of Nexstar Media Group, Inc.

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................1

JURISDICTIONAL STATEMENT ......................................4

STATEMENT OF THE ISSUES .......................................4

STATEMENT OF THE CASE...........................................7

    I.    Congress Directs The Commission To Periodically Consider Deregulation ........................................................8

    II.    The Commission's Quadrennial Reviews...........................10

    III.    The 2018 Quadrennial Proceeding....................................13

    IV.    This Challenge To The 2018 Order ...................................17

SUMMARY OF ARGUMENT .................................................17

STANDARD OF REVIEW .....................................................19

ARGUMENT.........................................................................20

    I.    The Order Violates Section 202(h). ..................................20

        A.    Section 202(h) Is A Deregulatory Statute Focused On Competition From New Sources................................21

            1.    Section 202(h) Is Deregulatory. ....................................21

            2.    Section 202(h) Directs the Commission to Consider Competition from Non-Broadcast Sources.................................................................25

            3.    The Commission's Interpretation Receives No Deference. .......................................................26

        B.    The Order Disregards The Deregulatory Nature of Section 202(h) And Ignores Competition From Non-Broadcast Sources.....................................27

1.     Refusing to Modify the Local Radio Rule and Tightening the Local Television Rule Violates Section 202(h)'s Deregulatory Mandate. .......................27

2.     Impermissibly Dismissing Competition from Non-Broadcast Sources Violates Section 202(h)'s Directive. .........................................................28

3.     Shifting the Burden to Broadcasters Violates Section 202(h)..............................................31

II.    The Order Violates the APA By Adopting Arbitrary And Capricious Market Definitions. ...........................................32

    A.    The Order Arbitrarily Dismisses Competition From Non-Broadcasting Sources.......................................32

    B.    The Order's Definition Of Broadcasting As A Permanently Closed Universe Blinks Reality...........................39

    C.    The Order's Citation Of DOJ Antitrust Practice Is Misplaced. ..................................................41

III.   The Order Failed To Justify Its Retention (And Tightening) Of The Local Radio And Television Rules And Ignored Substantial Record Evidence................................................42

    A.    The Order Fails To Justify Retaining The Local Television Rule's Top-Four Prohibition.................................42

        1.     The Record Does Not Support an Across-the-Board Demarcation between the Fourth and Fifth Stations. ........................................................43

        2.     Combinations among the Top Four Enhance Programming. ..............................................45

        3.     The Existence of Four Major Networks Does Not Justify Retaining the Top-Four Prohibition...................47

        4.     The Availability of Waivers Is Illusory..........................48

    B.    The Commission Failed To Justify Its Two-Station Limit.......50

C.      The Order's Abrupt Change To Note 11 Of The Local
        Television Rule Is Likewise Unjustified. ..................................51

D.      The Order Fails To Adequately Justify Retention Of The
        Local Radio Rule. ....................................................................54

        1.      The Commission Failed to Justify Retaining the
                Local Radio Rule, Including the Geographic
                Market Caps. ..................................................................55

        2.      The Commission Ignored Substantial Evidence
                that Combinations Will Enable Beneficial
                Economies of Scale. ......................................................59

IV.     The Order Is Unlawful For Additional Reasons. ................................61

A.      Retaining The Local Television and Radio Rules
        Undermines The Commission's Stated Goals. ........................62

B.      The Order's Revisions To Note 11 Contravene The
        Communications Act And The First Amendment. ..................65

V.      The Court Should Vacate The Local Television and Local
        Radio Rules. ........................................................................................69

CONCLUSION.......................................................................................................70

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABL Produce, Inc. v. U.S. Dep't of Agric.*,
    25 F.3d 641 (8th Cir. 1994) ....................................................5, 36, 55

*Am. Farm Bureau Fed'n v. EPA*,
    836 F.3d 963 (8th Cir. 2016) ........................................................4

*Barr v. Am. Ass'n of Political Consultants*,
    140 S.Ct. 2335 (2020)................................................................68

*Behlmann v. Century Sur. Co.*,
    794 F.3d 960 (8th Cir. 2015) ...................................................5, 22

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024) ......................................................69

*Chamber of Comm. v. SEC*,
    85 F.4th 760 (5th Cir. 2023) ......................................................58

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)......................................................................45

*Dubin v. United States*,
    599 U.S. 110 (2023)..................................................................22

*Env't Health Tr. v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021)........................................5, 42, 64, 65, 69

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005)..................................................................24

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..............................................................53, 64

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)...............................................................8, 12

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002)..................................1, 6, 9, 23, 62, 63

*Friends of Buckingham v. State Air Pollution Bd.*,
    947 F.3d 68 (4th Cir. 2020) .......................................................61

*La. Fed. Land Bank Ass'n v. Farm Credit Admin.*,
    336 F.3d 1075 (D.C. Cir. 2003)..................................................46

*Liscomb v. Boyce*,
    954 F.3d 1151 (8th Cir. 2020) ...................................................5, 21

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024).................................................26

*Menorah Med. Ctr. v. Heckler*,
  768 F.2d 292 (8th Cir. 1985) .............................5, 57, 58

*Motion Picture Association v. FCC*,
  309 F.3d 796 (D.C. Cir. 2002).........................6, 65, 67

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
*Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................5, 6, 39, 53

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) ..............................69

*Nat'l Lifeline Ass'n v. FCC*,
  921 F.3d 1102 (D.C. Cir. 2019)...........................44, 55

*Northshore Mining v. Sec'y of Labor*,
  709 F.3d 706 (8th Cir. 2013) ..............................5, 22

*Office of Cmmc'n of United Church of Christ v. FCC*,
  707 F.2d 1413 (D.C. Cir. 1983) ..............................68

*Prometheus Radio Project v. FCC*,
  373 F.3d 372 (3d Cir. 2004) ..........................23, 24, 46

*Prometheus Radio Project v. FCC*,
  824 F.3d 33 (3d Cir. 2016) ..................................10

*Prometheus Radio Project v. FCC*,
  939 F.3d 567 (3d Cir. 2019) ................................12

*Public Citizen v. Federal Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004) .............................29

*Pugin v. Garland*,
  599 U.S. 600 (2023).........................................25

*Red River Valley Sugarbeet Growers Ass'n v. Regan*,
  85 F.4th 881(8th Cir. 2023) ..................................5

*Sierra Club v. U.S. Army Corps of Engineers*,
  909 F.3d 635 (4th Cir. 2018) ...............................67

*Sierra Club v. W. Va. Dep't of Env't Prot.*,
  64 F.4th 487 (4th Cir. 2023) ..............................5, 36

*Sinclair Broad. Grp. v. FCC*,
  284 F.3d 148 (D.C. Cir. 2002)...............................23

*Telescope Media Grp. v. Lucero*,
  936 F.3d 740 (8th Cir. 2019) .............................6, 68

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) ............................................................................... 4

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) .........................................................................6, 67

*United States Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ........................................................... 48

*United States v. South Half of Lot 7 and Lot 8, Block 14*,
    910 F.2d 488 (8th Cir. 1990) .............................................................. 24

*W. Watersheds Project v. Haaland*,
    69 F.4th 689 (10th Cir. 2023) .................................................29, 41, 51

**Statutes**

5 U.S.C. § 706(2) ...................................................................................20, 69

28 U.S.C. § 2112(a) ....................................................................................... 4

28 U.S.C. § 2342(1) ....................................................................................... 4

28 U.S.C. § 2344 ............................................................................................ 4

47 U.S.C. § 201(a) ....................................................................................... 25

47 U.S.C. § 326 ............................................................................................ 62

47 U.S.C. § 402(a) ......................................................................................... 4

Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629,
    118 Stat. 3, 99-100 ............................................................................... 9

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 .................. 21

Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110
    Stat. 56, 111-12 ........................................................................1, 9, 21

Telecommunications Act of 1996, Pub. L. No. 104-104, § 230, 110
    Stat. 56, 138 ...................................................................................... 25

Telecommunications Act of 1996, Pub. L. No. 104-104, § 551, 110
    Stat. 56, 139 ...................................................................................... 26

**Regulatory Materials**

47 C.F.R. § 1.13 ............................................................................................. 4

47 C.F.R. § 73.3555(a) ................................................................................... 7

47 C.F.R. § 73.3555(b) ................................................................................... 7

47 CFR § 1.3 ................................................................................................. 49

*2020 Communications Marketplace Report*, 36 FCC Rcd 2945
(Dec. 31, 2020) ...................................................................................32

*2021 Update Public Notice*, 36 FCC Rcd 9363 (June 4, 2021)..............14

*2022 Communications Marketplace Report*,
37 FCC Rcd 15514 (Dec. 30, 2022) ......................... 2, 32, 33, 34, 35, 45, 47, 59

*Broad. Servs. Other Than Standard Broad.*, 6 Fed. Reg. 2282 (1941) ...................8

*In the Matter of 2014 Quadrennial Regulatory Review*,
29 FCC Rcd 4371 (Apr. 15, 2014) .......................................................53

*In the Matter of 2018 Quadrennial Review*, 33 FCC Rcd 12111
(Dec. 13, 2018) ...................................................................................13

*In re 2014 Quadrennial Regulatory Review—Order on
Reconsideration and Notice of Proposed Rulemaking*,
32 FCC Rcd 9802 (2017)....................................... 12, 22, 46, 53, 63, 64

*In re 2014 Quadrennial Regulatory Review—Second Report and
Order*, 31 FCC Rcd 9864 (2016)..........................................10, 52, 53

Order, LMS File Nos. 0000238010, 0000238009, 0000238018
(June 18, 2024)....................................................................................49

Report and Order and Further NPRM, MB Docket No. 20-401,
FCC 24-35 (Apr. 2, 2024)....................................................................61

*Rules Governing Standard & High Frequency Broad. Stations*,
5 Fed. Reg. 2382 (1940) ........................................................................8

**Other Authorities**

"Comcast Introduces Peacock, Netflix and Apple TV+ Streaming
Bundle," Comcast, https://tinyurl.com/44t9hm9p (May 21, 2024)....................11

H.R. Rpt. No. 104-204, 55 (1995) ........................................................8, 24

Merriam-Webster's Collegiate Dictionary, "Modify" (10th ed. 1995)...................23

Michael Schneider, "100 Most-Watched TV Series of 2023-24,"
Variety, https://tinyurl.com/5y2zkus8 (May 28, 2024) ......................................35

*Monthly Population Estimates for the United States: April 1, 2020 to
December 1, 2024*, https://tinyurl.com/43en6hy2,
U.S. Census Bureau, (June 7, 2024)............................................................35

*Resident Population Plus Armed Forces Overseas--Estimates by Age,
Sex, and Race: July 1, 1975*, U.S. Census Bureau,
https://tinyurl.com/mwwnmju2 (Oct. 8, 2021)................................................35

S. Rpt. 104-23 (1995)...........................................................................24, 26

# INTRODUCTION

In 1996, Congress loosened or eliminated multiple restrictions on broadcast ownership. In the same statute, Congress instructed the Federal Communications Commission to continue that deregulatory work by periodically reviewing then-existing regulations governing which and how many television and radio stations a single entity may own, and "repeal[ing] or modify[ing]" those regulations the Commission "determines" are no longer "necessary in the public interest as the result of competition." Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12. Recognizing the rise of cable and the emergence of the Internet and anticipating the competitive pressures those services would place on broadcasters, Congress designed Section 202(h) as a deregulatory tool—the statute "carries with it a presumption in favor of repealing or modifying the ownership rules." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002).

Nearly thirty years after Congress's deregulatory command, however, the broadcast industry remains saddled with antiquated restrictions—first imposed before the attack on Pearl Harbor—that prevent broadcasters from combining stations to achieve critical economies of scale, diversify programming, and attract valuable advertisers. When the 1996 Act passed, Americans privileged enough to have home Internet access used a dial-up modem, and smart phones were over a decade away. The Commission's own reporting in related contexts highlights these

seismic changes: more Americans now exclusively watch video through online streaming services (like Netflix, Hulu, and Amazon Prime) than watch over-the-air broadcast television, and about 170 million people listen to audio through Spotify and other online services every week. *See 2022 Communications Marketplace Report*, ¶¶ 283, 328, 37 FCC Rcd 15514, 15682, 15702 (Dec. 30, 2022).

Yet the Commission has stubbornly refused to admit the world has changed. Instead of modifying ownership rules to enable broadcasters to successfully compete as the media landscape evolves, the Commission has gone in the opposite direction by retaining its decades-old Local Radio and Television Rules—and even *tightening* the Local Television Rule. The Commission could only reach that outcome by twisting the statute and burying its head in the sand. Specifically, the Commission: (1) insisted that the *only* "competition" to traditional television and radio it should consider is competition *within and among television and radio broadcasters themselves,* excluding *all* non-broadcast media from the analysis; (2) shifted the burden to broadcasters to *disprove* the need for existing limits; (3) ignored legions of record evidence demonstrating the fierce competition broadcasters presently face; and (4) employed inconsistent and illogical reasoning throughout the Order.

Apparently, the Commission believes its sole job under Section 202(h) is to play defense. The agency approached its task like a basketball center blocking shots: the Order never seriously examines whether its rules are in the public interest as a

result of clear competition; instead it simply swats at certain alternative proposals. Section 202(h) requires much more. Congress directed the Commission to determine whether its broadcast ownership rules remain necessary in light of competitive changes; that undertaking requires a fresh look each time, and an affirmative, reasoned justification if the Commission determines the limits are still necessary. The Commission failed that task. Its action violates Section 202(h) and is arbitrary and capricious under the Administrative Procedure Act. The Local Radio and Television Rules should be set aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. §§ 2342(1) and 2344 and 47 U.S.C. § 402(a). Certain Petitioners filed their petitions for review within 10 days of the entry of the Order's publication in the Federal Register on February 15, 2024. *See* Pet. for Review No. 24-60088 (Feb. 23, 2024); No. 24-1380 Pet. for Review (Feb. 23, 2024); No. 24-10535 Pet. for Review (Feb. 24, 2024); *see also* 47 C.F.R. § 1.13. Those petitions, along with Petition for Review No. 24-1055 filed in the D.C. Circuit, were transferred to and consolidated in this Court under 28 U.S.C. § 2112(a). Consolidation Order (Mar. 5, 2024). Article III jurisdiction exists because "[a]t least one" petitioner undisputedly has standing to challenge the rule. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). For example, Zimmer Radio is directly subject to the rule's requirements. Similarly, many of NAB's members have standing to challenge the rules in their own right because they are directly subject to the rules, and thus NAB has associational standing. *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968-69 (8th Cir. 2016).

## STATEMENT OF THE ISSUES

**I.** Whether the Commission violated Section 202(h) of the 1996 Act by refusing to make any changes to the Local Radio Rule and even tightening the Local Television Rule, by refusing to consider competition from non-broadcast sources,

and by presuming that the rules remain necessary unless broadcasters demonstrate they are not.

- *Liscomb v. Boyce*, 954 F.3d 1151 (8th Cir. 2020)
- *Northshore Mining v. Sec'y of Labor*, 709 F.3d 706 (8th Cir. 2013)
- *Behlmann v. Century Sur. Co.*, 794 F.3d 960 (8th Cir. 2015)

**II.**     Whether the Commission's exclusion of all non-broadcast video and audio sources from its market definitions for the purpose of analyzing competition with respect to the Local Television and Radio Rules under Section 202(h) is arbitrary and capricious.

- *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)
- *ABL Produce, Inc. v. U.S. Dep't of Agric.*, 25 F.3d 641 (8th Cir. 1994)
- *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487 (4th Cir. 2023)

**III.**     Whether (a) retaining the Local Television Rule's blanket bans on owning more than two stations, or two of the top-four stations, in a geographic market, (b) attributing, for the first time, low-power television stations and multicast channels for purposes of the Top-Four Prohibition of the Local Television Rule, and (c) refusing to loosen the limits on how many radio stations a single entity may own in a geographic market, including subcaps for AM and FM stations, is arbitrary and capricious.

- *Env't Health Tr. v. FCC*, 9 F.4th 893, 908-09 (D.C. Cir. 2021)
- *Red River Valley Sugarbeet Growers Ass'n v. Regan*, 85 F.4th 881(8th Cir. 2023)
- *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292 (8th Cir. 1985)

**IV.** Whether retaining the Local Television and Radio Rules undermines the Commission's stated goals of competition, localism, and viewpoint diversity, and thus, is arbitrary and capricious.

- *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002)
- *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)
- *Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019)

**V.** Whether the Commission's tightening of the Local Television Rule unlawfully regulates program content under the Communications Act of 1934 and violates the First Amendment.

- *Motion Picture Association v. FCC*, 309 F.3d 796 (D.C. Cir. 2002)
- *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622 (1994)

## STATEMENT OF THE CASE

The Commission's broadcast ownership rules limit the number of radio and television stations an entity may own in a particular market. Section 202(h) of the 1996 Telecommunications Act ("1996 Act") requires the Commission to review its ownership rules every four years and to repeal or modify any rules no longer in the "public interest." Petitioners' challenge concerns the Local Radio Ownership Rule and the Local Television Ownership Rule:

- Local Radio Ownership Rule (47 C.F.R. § 73.3555(a)): An entity may own only a certain number of stations in a geographic market, e.g., up to eight in a market with at least 45 stations, up to seven in a market with 30-44 stations, etc.

- Local Television Ownership Rule (47 C.F.R. § 73.3555(b))

    - Two-Station Limit: No entity may own more than two full-power television stations in the same geographic market.

    - Top-Four Prohibition: Prohibits combinations among the top-four stations in the same geographic market.

    - Note 11 to section 73.35555: Prohibits network affiliation acquisitions the Commission considers to be the "functional equivalent" of station transactions barred by the Top-Four Prohibition. The Order revises Note 11 to ban agreements "to

acquire a network affiliation, directly or indirectly, if the change in network affiliation would result in the affiliation programming being broadcast from" a low-power television station or through a full-power television station's multicast stream such that an entity then owned more than one top-four "station."

## I.      Congress Directs The Commission To Periodically Consider Deregulation

The Commission first adopted rules limiting how many television and radio stations a single entity can own during World War II, *see Rules Governing Standard & High Frequency Broad. Stations*, 5 Fed. Reg. 2382, 2384 (1940); *Broad. Servs. Other Than Standard Broad.*, 6 Fed. Reg. 2282, 2284-85 (1941), and expanded its restrictions in the 1970s, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021).

By the 1990s, those rules were relics desperately needing reform.  A market once populated only by print newspapers and local broadcasting had been disrupted by an "explosion of video distribution technologies and subscription-based programming sources."  H.R. Rpt. No. 104-204, at 55; *see also Prometheus*, 592 U.S. at 418-19.  In this changed "competitive environment," caps on broadcast ownership were "no longer necessary" to protect consumers and instead were harmful to "the industry's ability to compete effectively in a multichannel media market."  H.R. Rpt. No. 104-204, at 55.

The 1996 Act, which amended the Communications Act of 1934, adopted multiple deregulatory measures, including repealing certain statutory ownership restrictions and directing the Commission to eliminate and relax other ownership rules. *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1033 (D.C. Cir. 2002) (*Fox I*) (citing 1996 Act).

Congress also established a mechanism to ensure that "the process of deregulation" kept pace with increasing competition. *Id.* Section 202(h) instructs that the Commission "review … all of its ownership rules biennially … and shall determine whether *any* of such rules are *necessary* in the public interest *as the result of competition*. The Commission *shall repeal or modify* any regulation it determines to be no longer in the public interest." Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (emphases added).[1] "Section 202(h) carries with it a presumption in favor of repealing or modifying the ownership rules." *Fox I*, 280 F.3d at 1048. The Commission must reevaluate whether each rule remains necessary in the public interest in light of existing competitive conditions. If the answer is "no," the rule must be eliminated or relaxed.

---

[1] Congress later extended the review period to every four years. Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100.

## II. The Commission's Quadrennial Reviews

The Commission has repeatedly failed to complete its reviews of the broadcast ownership rules in a timely manner—or at all—thereby delaying the deregulatory progress Congress decreed nearly thirty years ago. The starkest example is the 2010 proceeding, which was *never* finished. Instead, the Commission skipped it by unlawfully merging it into the 2014 review. *See Prometheus Radio Project v. FCC,* 824 F.3d 33, 50-51 (3d Cir. 2016). The Commission then did not issue its order until 2016—and rather than repeal any rules, it tightened its television regulations. *In re 2014 Quadrennial Regulatory Review—Second Report and Order*, 31 FCC Rcd 9864, 9865 (2016) (adopting television joint sales agreement attribution rule) ("2016 Order").

The consequences of inaction have been devastating for broadcasters. As the Commission stalled, the audio and video marketplace exploded with new platforms that are increasingly dominant. Spurred by broadband access and massive increases in bandwidth speeds, Internet-based video platforms and audio streaming services are now quotidian. For example, Netflix started its DVD business in the late 1990s when it competed with brick-and-mortar video rental stores like Blockbuster. After launching its streaming service in 2007, it now has tens of millions of U.S. subscribers, and many other streaming services offer immediate access to vast

libraries of programming and original video content. NAB Comments 45 (Apr. 29, 2019) (App.___).

The audio marketplace has similarly transformed. Spotify launched its streaming service in 2008, which catalyzed multiple similar services. Connoisseur Comments 11-13 (Apr. 29, 2019) (App.___-___). Millions of Americans start their day with podcasts covering any topic imaginable. And whereas drivers previously were limited to AM and FM radio stations, they now have instantaneous access to virtually every song ever recorded through smart phones and in-dashboard platforms like Apple CarPlay and Android Auto.

Internet-based services are not restricted to pre-recorded content. Live sports are available through multiple platforms, including the NFL on YouTube TV and Amazon Prime Video, the MLB on Hulu and Apple TV+, and the English Premier League on Peacock. Indeed, *each* of the major broadcast networks has its own streaming application. Affiliate Associations Reply Comments 4-7 (Oct. 1, 2021) (App.___-___). Comcast even bundles its cable and Internet services with subscriptions to Peacock, Netflix, and AppleTV.[2]

The Commission previously acknowledged that broadcasters compete with Internet-based services. In reconsidering its 2016 Order, the Commission expressly

---

[2] "Comcast Introduces Peacock, Netflix and Apple TV+ Streaming Bundle," Comcast, https://tinyurl.com/44t9hm9p (May 21, 2024).

accounted for competition with Internet-based services and cable, even while retaining its "focus[] on preserving competition among local broadcast" stations. *In re 2014 Quadrennial Regulatory Review—Order on Reconsideration and Notice of Proposed Rulemaking*, ¶ 71, 32 FCC Rcd 9802, 9833-34 (2017) ("2017 Order"). The Commission thus loosened the limits on television station ownership, concluding that the modifications would "help local television broadcasters achieve economies of scale and improve their ability to serve their local markets in the face of an evolving video marketplace." *Id.* ¶ 72, 32 FCC Rcd at 9834.

The 2017 Order was challenged in court, primarily on the ground that the Commission had not adequately considered how relaxing the broadcast ownership rules would affect minority and female ownership diversity; the Commission's consideration of competition with non-broadcast sources was not contested. *See Prometheus Radio Project v. FCC*, 939 F.3d 567 (3d Cir. 2019). The Supreme Court unanimously upheld the 2017 Order. In doing so, the Court reiterated that Section 202(h) "requires the FCC to keep pace with industry developments," including "[t]echnological advances" that have "led to a massive increase in alternative media options, such as cable television and the Internet." *Prometheus*, 592 U.S. at 418-19.

### III. The 2018 Quadrennial Proceeding

The Commission began its next review in December 2018 by issuing a notice of proposed rulemaking ("NPRM"). *In the Matter of 2018 Quadrennial Review*, 33 FCC Rcd 12111 (Dec. 13, 2018). Regulated parties commissioned studies, gathered empirical data, and submitted massive amounts of other evidence. For example, Connoisseur Media provided data-filled reports from leading industry analysts Edison Research and Borrell Associates demonstrating that radio competes with digital sources both for listeners and advertising. Connoisseur Comments, Exh. A, B (App.__). Gray Television submitted evidence of the Top-Four Prohibition's deleterious effects in small and medium-sized markets, and a study showing that local television station combinations increased news programming and cushioned declines in advertising revenues. Gray Television Comments 4-7 (Apr. 30, 2019) (App.__-__); Gray *Ex Parte* (Oct. 13, 2020) (App.__). And NAB commissioned extensive empirical research—among many other things, (i) two studies from BIA Advisory Services documenting the severe competitive challenges facing local radio stations and the irrationality of the Top-Four Prohibition; and (ii) a study from NERA illustrating the depletion of broadcasters' revenue base caused by advertisers increasingly viewing them as substitutable with digital platforms. NAB Comments, Attachments A, B (App.__-__); NAB Refresh Comments 55-59 (Sept. 2, 2021) (App.__-__).

After the Supreme Court upheld the 2017 Order, the Commission requested a record "refresh." *2021 Update Public Notice*, 36 FCC Rcd 9363 (June 4, 2021). Regulated parties supplemented the already comprehensive record. For example, NAB submitted copious evidence that the COVID-19 pandemic accelerated consumers' usage of Internet-based outlets and the "digital transformation of the advertising market," to broadcasters' detriment. NAB Refresh Comments 64-99 (App.__-__). And the network television associations explained how the video marketplace had changed fundamentally since the Commission initiated the 2018 proceeding—including broadcast networks' introduction of direct-to-consumer platforms that "make[] network content directly available to viewers that, until recently, was distributed almost exclusively by local affiliates." Refresh Reply Comments 4-7 (Oct. 1, 2021) (App.__-__).

Multiple commenters further explained how a material relaxing of the Commission's rules would enable stations to remain competitive. NAB cited unrefuted economic studies from earlier Commission proceedings, which found television broadcasting and local news production were subject to strong economies of scale and greater local scale would enable stations to spread the high cost of news production across more outlets. NAB Comments 60-61 (App.__-__). Similarly, Connoisseur submitted declarations from numerous radio broadcasters detailing concrete examples showing that loosening the rules would facilitate their ability to

compete and, in some cases, simply remain in business.  Connoisseur Comments, Exh. C (App.__-__).

Yet the Commission did nothing, acting only after NAB filed a mandamus petition—and after initiating the *next* (2022) quadrennial review.  Under threat of potential mandamus, *see Order*, *In re NAB*, No. 23-1120 (D.C. Cir. Sept. 28, 2023), the Commission, by a 3-2 vote, finally issued the 2024 Order.  But despite five-plus years and four comment periods, the Commission's consideration of the evidence was desultory.  Instead, the Order's conclusions were preordained.

The Commission went to extreme lengths to retain the Local Radio and Television Rules—and to expand the Television Rule.  For both radio and television, the Commission maintained outdated market definitions, remarkably excluding all multichannel and Internet-based platforms from the competition-centric analysis that Section 202(h) mandates.  The Order imagines the relevant market as a fictional closed universe in which radio broadcasters compete only with other radio broadcasters and television broadcasters compete only with other television broadcasters.  The Commission ignored reams of evidence showing erosions of viewership/listenership and advertising revenues for broadcasters, and a near-inverse explosion in digital media and advertising.

As a result, the Local Radio Rule's restrictions remain virtually untouched since the 1996 Act despite record evidence illustrating fundamental changes to

Americans' listening habits even in the years since 2019, as well as debilitating declines in radio stations' revenues, and threats to smaller market stations' viability.

The Commission similarly left undisturbed the Local Television Rule's across-the-board Top-Four Prohibition and *per se* ban on owning more than two stations in a geographic market—ignoring unrefuted evidence illustrating heterogeneity among markets, including particular challenges for broadcasters in small and mid-size locations. Worse, the Commission *tightened* the rule by, for the first time, bringing low-power television stations and multicasting within the scope of Note 11 of the Commission's multiple ownership rules—which aims to prohibit exchanges of network affiliations that the Commission believes would otherwise violate the Top-Four Prohibition. Order ¶¶ 12, 98 (App.__, __). In doing so, the Commission failed to address its previous statements rejecting cable and satellite television's call to expand Note 11 largely due to the myriad public interest benefits of airing top-rated programming on low-power television and multicast streams. It similarly failed to meaningfully grapple with the First Amendment implications of the expanded Note 11 or to respond to arguments about the agency's statutory authority.

Instead, the Commission cherry-picked data, ignored reliable studies undermining its central conclusions, misleadingly cited key authorities, and overlooked obvious alternatives to its chosen course of action.

## IV. This Challenge To The 2018 Order

Petitioners filed petitions for review of the Order in various circuits, which were consolidated in this Court following a judicial lottery. Subsequently, television affiliate associations and radio broadcasters intervened in support of Petitioners. Collectively, Petitioners and Intervenors represent thousands of television and radio broadcasters operating under the Commission's draconian ownership rules—from a small set of radio stations in mid-Missouri to a large, national industry association. Many broadcasters seek the benefits of station combinations, including diffusing costs, achieving valuable economies of scale that can fuel investments in locally relevant programming, attracting larger audiences, and diversifying their advertising base.

## SUMMARY OF ARGUMENT

**I.** Section 202(h) is a deregulatory statute requiring the Commission to remove or modify regulations based on changes in the competitive landscape. The text and structure of Section 202(h), confirmed by the 1996 Act's legislative history, instruct the Commission to take *de*regulatory measures. Congress placed competition front and center in Section 202(h) with no limitations, directing the Commission to consider competition in all forms and from all sources.

The Commission violated Section 202(h) in three ways. It refused to repeal or loosen the Local Radio and Local Television Rules and, even worse, *tightened* the

latter.  It adopted an impossibly narrow definition of competition that neuters Section 202(h) by considering only competition between radio broadcasters and between television broadcasters, excluding not only competition from non-broadcast sources but even competition *between* radio and television.  Finally, whereas Congress placed the burden on *the Commission* to demonstrate that its rules *remain* necessary, the Commission shifted that burden to *broadcasters* to prove that its rules are *not* necessary.  The Commission's pre-emptive invocation of the obsolete *Chevron* doctrine cannot save its errors.

**II.**     The Order's myopic and antiquated competition analysis is arbitrary and capricious under the Administrative Procedure Act ("APA").  The Commission disregarded significant record evidence demonstrating a fundamental transformation of the video and audio marketplaces.  The Commission exacerbated that error by irrationally placing disproportionate emphasis on "unique" features of broadcasting in an effort to permanently exclude consideration of competition from non-broadcast sources.

**III.**     The Order's retention of the Local Television Rule's Top-Four Prohibition and Two-Station Limit, the revision to the Local Television Rule's Note 11, and retention of the Local Radio Rule are arbitrary and capricious.  The Commission failed entirely to justify its bright-line prohibitions on owning more than one top-four ranked television station, and two stations in total, in any market

across the country, and ignored substantial evidence that common ownership is beneficial. And when expanding Note 11's scope, the Commission failed to adequately explain its sudden about-face regarding the benefits of airing major network programming through multicasts and low-power television stations. With respect to the Local Radio Rule, the Commission failed to justify the limits on local station ownership, including AM/FM-specific subcaps, and ignored substantial evidence that combinations enable broadcasters to achieve vital economies of scale and that radio broadcasters increasingly struggle to attract advertisers and audiences.

IV. The Order is additionally unlawful for two reasons. *First*, retaining the Local Television and Radio Rules undermines the Commission's own stated goals of promoting competition, localism, and viewpoint diversity. *Second*, the Commission's tightening of Note 11 violates the Communications Act, including Section 326, and the First Amendment by restricting the programming content broadcasters can air on their own stations.

V. Because the Order violates the APA and Section 202(h), the proper remedy is vacatur of the Local Television Rule (including Note 11) and the Local Radio Rule (including the AM/FM subcaps).

## STANDARD OF REVIEW

This Court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"

"contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

## ARGUMENT

### I.     The Order Violates Section 202(h).

Section 202(h) requires the Commission to take a fresh look at its ownership rules every four years.  In each proceeding, it must determine whether its rules restricting ownership of broadcast stations continue to serve the public interest in light of rapidly changing competitive conditions.

Relying on the obsolete *Chevron* doctrine, the Commission turned Section 202(h) on its head.  *See* Order ¶ 18 (App.__).  The Order flipped the presumption embedded in the statute; instead of evaluating whether the rules *remain* justified, the Commission required broadcasters to prove they are *not* justified.  Making matters worse, the Commission applied a narrow and atextual definition of the competitive market, thereby permanently excluding consideration of competition from all non-broadcasters.  Adding insult to injury, the Commission made the Local Television Rule more stringent by reversing course and bringing multicasting and low-power television stations within its ambit.  The Order thus violates Section 202(h)'s deregulatory mandate thrice over.

## A. Section 202(h) Is A Deregulatory Statute Focused On Competition From New Sources.

The first page of the 1996 Act states that its purpose is to "promote competition and reduce regulation." Pub. L. No. 104-104, 110 Stat. 56. Congress recognized that broadcasters were already competing with non-broadcast sources, including cable and emerging technology. Congress thus established a process by which the Commission would regularly eliminate or at least relax broadcast ownership rules when they impede broadcasters' ability to compete with those non-broadcast sources.

### 1. Section 202(h) Is Deregulatory.

Section 202(h) requires the Commission to periodically determine whether, in light of competition, the ownership rules remain necessary to promote the public interest. That is, the burden is on the Commission to demonstrate that the existing rules are still needed. If they are not, the Commission has two options: *repeal* them, or *loosen* them.

Statutory interpretation begins with the text. *Liscomb v. Boyce*, 954 F.3d 1151, 1154 (8th Cir. 2020). Section 202(h) directs the Commission periodically to "review … all of its ownership rules" and "determine whether any … are necessary in the public interest as the result of competition." Every four years, it must "*determine*" whether its rules "*are*"—presently—necessary. The Commission thus has an affirmative obligation to justify its rules every four years based on a new

record—retaining an ownership rule is akin to reimposing it. If the Commission determines that a rule is still necessary, that is the end of the matter—the rule remains.

But if the Commission concludes otherwise, the Commission must (i) "repeal" the rule or (ii) "modify" it. The first option is simplest. For example, the Commission previously concluded that the Newspaper/Broadcast Cross-Ownership Rule and Radio/Television Cross-Ownership Rule "no longer serve[] the public interest and should be repealed." 2017 Order, 32 FCC Rcd at 9880-81.

However, if the Commission concludes that full repeal is not warranted— because *some* ownership limit is still in the public interest—it must "modify" the rule. That means loosening the rule. The structure of Section 202(h) demonstrates that modification runs in one direction. *See Dubin v. United States*, 599 U.S. 110, 120 (2023); *see also Northshore Mining v. Sec'y of Labor*, 709 F.3d 706, 710 (8th Cir. 2013) ("'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme'") (citation omitted). Modification comes into play *after* the Commission has concluded that a rule as currently constituted is no longer necessary. The only question is whether the entire rule must go. It would be bizarre if Congress had authorized the Commission to *add to or tighten* a rule that is *no longer necessary*. *See Behlmann v. Century Sur. Co.*, 794 F.3d 960, 964 (8th Cir. 2015) (rejecting "reading of the statute lead[ing] to unreasonable and illogical

results"). Indeed, the word "modify" should be read in the context of the verb immediately preceding it: "repeal." *See also* Merriam-Webster's Collegiate Dictionary (10th ed. 1995) ("modify" means to "moderate" or "make less extreme"). The proper understanding of "modify" flows naturally from Section 202(h)'s deregulatory structure.

As the D.C. Circuit has summarized, Section 202(h) was designed to "continue the process of deregulation." *See Fox I*, 280 F.3d at 1033; *see also Sinclair Broad. Grp. v. FCC*, 284 F.3d 148, 159 (D.C. Cir. 2002). Congress "imposed upon the Commission a duty to examine critically the new [rule] and to retain it only if it continued to be necessary." *Fox I*, 280 F.3d at 1043. At base, "Section 202(h) carries with it a presumption in favor of repealing or modifying the ownership rules." *Id.* at 1048.

The Commission relied on a divided Third Circuit panel that adopted a different interpretation of the statute. *See* Order ¶ 12 (App.__) (citing *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) (*Prometheus I*)). But even the Third Circuit recognized that "[t]he text and legislative history of the 1996 Act indicate that Congress intended periodic reviews to operate as an 'ongoing mechanism to ensure that the Commission's regulatory framework would keep pace with the competitive changes in the marketplace.'" *Prometheus I*, 373 F.3d at 391; *see also id*. at 394 (stating "§ 202(h) was enacted in the context of deregulatory

amendments").[3]    Ultimately, the Third Circuit's decision cannot overcome the language and purpose of Section 202(h).    The Commission departs from Section 202(h)'s analytical framework based on an incomplete selection of legislative history.  *See* Order ¶ 17 (App.__).  As a preliminary matter, this legislative history cannot contradict the plain text of the statute.  *United States v. South Half of Lot 7 and Lot 8, Block 14*, 910 F.2d 488, 490 (8th Cir. 1990).  In any event, the 1996 Act's legislative history *confirms* that Section 202(h) established a presumption in favor of *de*regulation.  For instance, the House of Representatives report states that the purpose of the bill was to "promote competition and *reduce* regulation."  H.R. Rpt. No. 104-204, at 1 (1995) (emphasis added).  And a Senate Report explains that Congress wanted to ensure broadcasters could continue to compete in light of emerging technologies.  S. Rpt. 104-23, at 1-5 (1995).  The Commission's one-sided discussion of the legislative history (*see* Order ¶ 19, App.__) picks out the Commission's few friends from the crowd of contrary evidence.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

---

[3] In dissent, Judge Scirica explained that, "on the cusp of an unprecedented revolution in communication technologies, Congress set in motion this statutorily-prescribed process of media *de*regulation."  *Prometheus I*, 373 F.3d at 438 (emphasis added).

## 2. *Section 202(h) Directs the Commission to Consider Competition from Non-Broadcast Sources.*

Congress was crystal clear on what to consider in carrying out the deregulatory mandate in Section 202(h): the Commission must periodically evaluate whether the ownership rules remain necessary in light of *competition*. Congress notably opted not to use the unadorned phrase "public interest," as it did elsewhere in the Communications Act of 1934. *E.g.*, 47 U.S.C. § 201(a) ("in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable *in the public interest*") (emphasis added). Rather, Congress specifically instructed the Commission to consider whether rules are necessary "in the public interest *as the result of competition*." Placing competition front and center in the public interest analysis was a deliberate choice. *See Pugin v. Garland*, 599 U.S. 600, 608 (2023).

Section 202(h) requires that the Commission consider competition in all forms and from all sources, without limitation. Congress did not qualify its instruction. It could have, for example, told the Commission to consider "competition within television broadcasting and radio broadcasting, respectively" or even "competition within the broadcast industry." But it did not. That is because Congress specifically wanted the Commission to consider competitive forces *outside* broadcasting. Demonstrating its awareness of emerging technology, Congress in the 1996 Act expressly noted the proliferation of a "rapidly developing array of Internet and other interactive computer services," § 230, 110 Stat. 56, 138, and identified the

"pervasive" effects of cable programming, § 551, 110 Stat. 56, 139. There is no textual indication that "competition" is limited to competition among radio broadcasters and among television broadcasters. And the legislative history confirms that Congress was concerned with empowering broadcasters to adapt to current and new forms of competition. *See, e.g.*, S. Rep. No. 104-23, at 1-5; H.R. Rep. No. 104-204, at 54-55. Section 202(h) thus *requires* that the Commission consider competition from novel sources, including streaming services like Apple Music and Netflix.

### 3.    *The Commission's Interpretation Receives No Deference.*

The Commission pre-emptively claimed its "interpretation … of section 202(h)" should receive "considerable latitude" because the statute is purportedly ambiguous. Order ¶ 18 (App.__). The Commission claimed broad authority to regulate broadcasting as it sees fit, because the "necessary in the public interest as a result of competition" phrase is potentially vague. But even if Section 202(h) were ambiguous (it is not, for the reasons discussed above), *Chevron* deference is dead. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").

**B.    The Order Disregards The Deregulatory Nature of Section 202(h) And Ignores Competition From Non-Broadcast Sources.**

The Order violates Section 202(h) in three core ways.  *First*, although Section 202(h) is a deregulatory statute, the Commission refused to modify the Local Radio Rule and actually *tightened* the Local Television Rule.  *Second*, although Congress directed the Commission to consider competition in all forms, the Commission excluded *any* competition from non-broadcast sources.  *Third*, the Commission repeatedly placed the burden on *broadcasters* to prove that the ownership rules are *not* justified, whereas the statute requires the *Commission* to show that the rules *remain* justified.

**1.    *Refusing to Modify the Local Radio Rule and Tightening the Local Television Rule Violates Section 202(h)'s Deregulatory Mandate.***

The Commission's first error is straightforward.  Section 202(h) is a deregulatory statute.  While rules can be retained if the Commission adequately concludes they remain necessary in the public interest after considering competition, the presumption of the regulatory review is toward making them less restrictive over time as competition evolves.  The Commission, however, chose a third path:  it not only refused to make any changes to the Local Radio Rule, it *added to* the Local Television Rule.  Keeping ancient rules such as the Local Radio Rule in the face of rampant competition and a multitude of other evidence that they are no longer needed violates Section 202(h).  *See supra* 20-31.  The same is true for the Local

Television Rule's core prohibitions. *See supra* 27-31. And tightening Note 11 violates Section 202(h) because the Commission lacks statutory authority to make the broadcast ownership rules more restrictive as part of its statutorily-mandated ownership review.[4]

### 2. *Impermissibly Dismissing Competition from Non-Broadcast Sources Violates Section 202(h)'s Directive.*

The Commission claimed to consider competition. *E.g.*, Order ¶¶ 1-2 (App.___). But the Order tells a different story. The Commission considered only a very limited type of competition—competition *among broadcasters*. In fact, the Commission's world of competition is far narrower because it specifically segregated competition in *radio* broadcasting from competition in *television* broadcasting. *E.g.*, Order ¶¶ 33, 73 (App.___, ___-___). And when it comes to the multitude of audio and video platforms that take an increasing share of viewership and listenership—as well as an increasing share of advertising revenue—the Commission acknowledged that competition but did not factor it into the Section 202(h) analysis. At all. Section 202(h)'s directive, however, is clear—the Commission must consider the effects of competition, without limitation. Yet the

---

[4] As explained below, the Commission also lacks substantive statutory authority to revise Note 11 in this manner, and the revision violates the First Amendment and is arbitrary and capricious under the APA. *See infra* 65-69.

Commission refused to consider even other plainly *local* competitors, such as newspapers.

The Commission's interpretation of "competition" is also circular. The reasoning goes as follows: radio and television broadcasting (supposedly) have characteristics that make them unique. And since broadcasting is different, other services, by definition, occupy a different market and, thus, competition from those sources is irrelevant. *See* Order ¶¶ 38-40, 74-75 (App.__-__, __-__). The Commission effectively concluded that, to factor into its analysis, a source must be a complete substitute for broadcast radio or television. The Commission acknowledged that broadcasters face competition from non-broadcast sources. *See, e.g.*, Order ¶ 75 (App.__-__). But it concluded that such competition is irrelevant because non-broadcast sources are, at most, partial competitors. *See id.* Nothing in the statute says perfect substitution is required.[5]

Taking the Commission's position to its logical conclusion demonstrates the fallacy of its reasoning. Under the approach taken by the Order, even if video

---

[5] The implication is that the Commission would only consider competition from non-broadcast sources if they are complete substitutes for radio and television—such as a decision to buy an iPhone vs. an Android. That reasoning is arbitrary and capricious, *see, e.g.*, *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004), as is its imposition of the extra-statutory requirement that only perfect substitutes can be considered under Section 202(h), *W. Watersheds Project v. Haaland*, 69 F.4th 689, 700 (10th Cir. 2023).

streaming services like Netflix accounted for 99% of viewership and audio streaming services like Spotify accounted for 99% of listenership, the market would still be limited to broadcasters because of broadcasters' purportedly unique characteristics. Stated another way, broadcasting could be taken to near death by competition with Internet-based services, satellite, and cable, but the Commission's position would allow no relief from the ownership rules simply because broadcasting is broadcasting.

The 1996 Act drew no such distinctions. A marketplace competitor need not operate the same way and under the same regulatory strictures as a traditional broadcaster. Indeed, then-existing competition from cable and the emergence of the Internet was a significant catalyst for the 1996 Act. It makes no sense for Congress, on the one hand, to note the prevalence of cable and the growing Internet, while restricting consideration of "competition" in a manner that would permanently exclude new forms of technology. Platforms need not be a spitting image of broadcasting to factor into the Section 202(h) analysis.

Even assuming arguendo that digital platforms are properly characterized as only *partial* substitutes for broadcasting, the Commission was statutorily obligated to factor that competition into its public interest analysis. It failed that task.

### 3. *Shifting the Burden to Broadcasters Violates Section 202(h).*

The Commission also shirked its statutory obligation to demonstrate that the Local Radio and Television Rules (and all facets of those rules) remain necessary. In fact, the Commission stridently declared that the presumption is "against changes in current policy." Order ¶ 17 (quotation marks omitted) (App.___). To the contrary, with Section 202(h), Congress directed the Commission—every four years—to "*determine*" whether any of its rules "*are*" necessary in the public interest. Congress's word choice is significant. The Commission must take a fresh look at its rules every four years and, if it decides to keep them in place, explain why they *are*—currently—necessary. The Order flips the script. The Commission presumed that its rules are necessary and keeps them in place unless *broadcasters* can demonstrate (to the Commission's satisfaction) that the rules are *not* necessary. *See, e.g.*, Order ¶ 32 (App.___) ("There is no consensus in the record, however, regarding whether changes to the Local Radio Ownership Rule would enable radio owners to respond to these developments more effectively").

That approach completely inverted the Section 202(h) process and saved the Commission from undertaking the arduous (and likely impossible) task of affirmatively justifying its rules with a current understanding of the relevant market—rather than a static understanding ported over from prior proceedings.

## II.     The Order Violates the APA By Adopting Arbitrary And Capricious Market Definitions.

As discussed above, the Order violates Section 202(h) by refusing to follow the statute's mandate to consider all competition to broadcasters, instead dismissing obvious competition from Internet-based sources, as well as cable and satellite. But even assuming Section 202(h) did not categorically prohibit that approach, the Commission's reasoning for adopting its restrictive market definitions for its competition analyses does not withstand APA scrutiny. *First*, the Commission repeatedly and egregiously disregarded material evidence demonstrating that broadcasters face substantial competition from non-broadcast sources. *Second*, the Commission used supposedly distinguishing features of broadcasting to permanently close off the relevant market to any non-broadcast sources. *Finally*, outdated Department of Justice ("DOJ") antitrust enforcement actions with narrow market definitions are inapposite.

### A.     The Order Arbitrarily Dismisses Competition From Non-Broadcasting Sources.

The Commission itself has previously and repeatedly recognized that broadcasters compete in the broader "[v]ideo [m]arketplace" and "[a]udio [m]arketplace." *2022 Communications Marketplace Report*, ¶¶ 212-328, 37 FCC Rcd at 15652-702; *2020 Communications Marketplace Report*, ¶¶ 150-274, 36 FCC Rcd 2945, 3047-100 (Dec. 31, 2020). Thus, the Commission has conceded that

"[t]here are three primary categories of participants in the video marketplace: multichannel video programming distributors (MVPDs), online video distributors (OVDs), and broadcast television stations," and that "competition among both these participants and video programming options have evolved." *2022 Communications Marketplace Report*, ¶ 212, 37 FCC Rcd at 15652. Similarly, the Commission has admitted that "[c]onsumers can access audio programming from multiple sources" and that "[t]he major participants in today's marketplace for the delivery of audio programming" are: "terrestrial radio broadcasters, satellite radio providers, and online audio providers." *Id.* ¶ 295, 37 FCC Rcd at 15689.

Nevertheless, the Order ignores substantial evidence and its own findings that broadcasting competes directly with Internet-based services, satellite, and cable. In particular, the record demonstrates that digital services are seeing substantial audience gains while broadcast audiences decrease. *See, e.g.*, NAB Comments, Attachment B (BIA Television Study documenting declines in viewership for broadcasting); *The Evolution of Competition in Local Broadcast Television Advertising and the Implications for Antitrust and Competition Policy*, NERA 12-18 (Oct. 2020) ("NERA Study") (App.__-__) (attached to Department of Justice *Ex Parte* (Jan. 6, 2021)); *2022 Communications Marketplace Report* ¶ 284, 37 FCC Rcd at 15682 (viewership of online video services grew while broadcast viewership fell, with viewing time for online services now well exceeding broadcast); Connoisseur

Letter Exh. B to Attachment A (Nov. 9, 2023) (time spent listening to AM/FM over-the-air fell 35% from 2014-2022, while time spent listening to streaming sources grew by 103%) (App.__).

**Video.** The intensity of competition in the video marketplace has grown immensely in recent years, and the comparison between broadcast and Internet-based streaming is stark. Citing only the first half of a sentence from its *2022 Communications Marketplace Report* (¶ 283, 37 FCC Rcd at 15682), the Commission noted that merely 15% of "U.S. television households … use free, over-the-air television," as if that justifies dismissing competition from non-broadcast video sources. Order ¶ 74 (App.__). But even worse, it ignored the second half of the cited sentence, which explains that 80% of those same "households also subscribed to" an Internet-based streaming service, thereby undercutting the Commission's claims about the separateness of broadcast television. *2022 Communications Marketplace Report* ¶ 283, 37 FCC Rcd at 15682. The Commission also omitted that from 2018 to 2021, the portion of U.S. television households that "relied *only* on [Internet-based streaming] for video service" increased from 9% to 27%—*nearly double* the number of households using over-the-air broadcast. *Id.* (emphases added). A full "78% of all U.S. households subscribed to at least one of the three top" services (Netflix, Amazon Prime Video, and Hulu). *Id.*; *see also id.* ¶ 256, 37 FCC Rcd at 15671-72 (digital video

subscription services increased from 222 to 331 million subscriptions from 2019 to 2021—a 50% increase in just two years); *id.*¶ 254, 37 FCC Rcd at 15670 (in 2021, 80% of U.S. households consumed advertising-based digital video services).

The Commission nevertheless minimized the steep declines in broadcast viewership, claiming that broadcast networks "earn higher and more consistent ratings." *See* Order ¶ 120 (App.__). But in fact viewership for television programs broadcast on the major networks has dramatically eroded. For instance, the ratings for the top-rated show during the 2020-2021 season were 72% lower than the ratings for the top-rated program aired in the 1985-1986 season. NAB Refresh Comments, Attachment I (App.__). If anything, just looking at the ratings understates the problem, given the immense growth in the American population. The top-rated show of 1975—*All in the Family*—averaged more than 21 million viewers, while the most popular scripted show of 2023—*Tracker*—brought in about 10 million.[6] But the population of the United States increased 55% over the same period.[7]

---

[6] Michael Schneider, "100 Most-Watched TV Series of 2023-24," Variety, https://tinyurl.com/5y2zkus8 (May 28, 2024).

[7] *See Resident Population Plus Armed Forces Overseas--Estimates by Age, Sex, and Race: July 1, 1975*, U.S. Census Bureau, https://tinyurl.com/mwwnmju2 (Oct. 8, 2021); *Monthly Population Estimates for the United States: April 1, 2020 to December 1, 2024*, https://tinyurl.com/43en6hy2, U.S. Census Bureau, (June 7, 2024).

Equally troubling, the Commission ignored robust data assembled about the erosion of broadcasters' advertising base. The 2018 NPRM solicited data and studies to assess whether, and the extent to which, advertisers view digital platforms and broadcasters as substitutes. *See* NPRM ¶ 51 (App.__). Despite this request, the Commission ignored—among other evidence—an extensive NERA study that DOJ submitted to the Commission. The study documented significant evidence that advertisers increasingly view digital platforms as a substitute for local television and that the clear trend in advertising budgets is toward online platforms. *See* NERA Study 27-35 (App.__-__).

The Commission did not engage with—or even identify—the sophisticated NERA Study assembled by leading economists, instead dismissing it in a footnote without acknowledging that DOJ thought it relevant to the 2018 review. *See* Order ¶ 70 n.240 (App.__). Instead, the Commission attempted to rebut the NERA study by citing two comments written *before the NERA study was submitted into the record*. Unsurprisingly, then, neither commenter responded to NERA's findings, nor presented any empirical evidence to the contrary. Ignoring the NERA Study's findings is arbitrary and capricious. *See ABL Produce, Inc. v. U.S. Dep't of Agric.*, 25 F.3d 641, 646 (8th Cir. 1994) (agency's failure to consider record evidence violated APA); *see also Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487,

502 (4th Cir. 2023) ("Record evidence contrary to an agency's conclusion requires further elaboration and must be grappled with.") (cleaned up).

**Audio.** The audio marketplace has similarly transformed. Commenters submitted extensive evidence showcasing how Americans' listening habits have changed, including that 70% of those age 12 and older now listen to online audio *weekly,* compared to the 6% that had *ever* listened to online audio in 1998. Connoisseur Letter Exh. A to Attachment B (Nov. 9, 2023) (App.__). Radio stations' Average Quarter Hour (AQH) listening—the metric upon which advertising is sold—fell 30.3% from 2003-2018, and FM stations' AQH listening declined 23.5% just from 2016-2021. NAB Refresh Reply Comments 67-68 (App.__-__); NAB Comments Attachment A at 5 (BIA Advisory Services, *Local Radio Station Viability in the New Media Marketplace* ("BIA Radio Study")) (App.__). The record also demonstrates that radio broadcasters directly compete with digital platforms for advertising revenue. For example, Borrell Associates "concluded that local advertisers see radio and digital advertising as substitutes— shifting dollars back and forth between these media for various reasons." Connoisseur Comments, Exh. B (App.__) (citing *Statistical Data from Borrell Associates* B-4). Strikingly, the average annual expenditures for local radio advertisers fell by 46% from 2017 to 2022, while digital platforms' share of all local advertising in the United States was over 67% in 2022 and is projected to rise to

74% by 2026.  Connoisseur Letter Exh. F to Attachment A 2-4 (Nov. 9, 2023) (*Borrell 2023 Digital Advertising Report* 4) (App.__-__).  As it did with the video marketplace, the Commission simply dismissed the evidence of intense competition in the audio marketplace.  Although digital platforms occupy a two-thirds and a growing share of local advertising dollars, the Commission remarkably still clung to the view that broadcast radio stations do not compete with digital platforms.

*****

In sum, the Commission blinded itself to a critical aspect of the problem by artificially limiting its market definitions to only radio broadcasting and only television broadcasting.  The widespread availability of high-speed broadband Internet access and immense improvements in mobile technology have enabled digital platforms to compete directly with other sources of information and entertainment that previously were more insulated from competition.  The Commission pretended as if nothing has changed, claiming that "[t]elevision, movies, books, newspapers, magazines, concerts, plays, and all manner of activities present consumers with countless options for how to spend their time or be entertained or informed."  Order ¶ 38 (App.__).  But universal access to smart phones, myriad other digital devices and the Internet—including in the car—have completely upended the competitive landscape through ubiquitous digital streaming.  While broadcasters have always faced competition for people's attention, the

Commission ignored the dramatic differences in the intensity and sheer volume of that competition, as well as the closer resemblance of streaming audio and video to traditional radio and television. The Commission's blatant disregard of substantial record evidence demonstrating competition from non-broadcast sources borders on the preposterous. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43 (1983).

### B. The Order's Definition Of Broadcasting As A Permanently Closed Universe Blinks Reality.

As shown above, the Commission ignored reams of evidence that broadcasters face competition from a multitude of sources, including from streaming services, cable, satellite, and online video applications—just to name a few. But the Order does more harm than simply ignoring evidence in the present record. For the first time, the Commission has attempted to *permanently* exclude any consideration of competition from non-broadcast sources.

To justify that move, the Order merely *describes broadcasting*, defining it based on "unique" characteristics—specifically that it is free, that broadcasters are locally licensed and focus to some extent on local programming, and that television broadcasters can receive retransmission consent fees. The Commission then reasoned that, because broadcasting is different than other participants in the video and audio marketplaces, (i) radio broadcasters can only *ever* compete with other radio broadcasters, and (ii) television broadcasters can only *ever* compete with other

television broadcasters. While it is true that broadcasting bears the features described by the Order, that does not support the Commission's radical conclusions.

The Commission's move is a transparent attempt to overlook uncontroverted record evidence demonstrating that broadcasters face intense competition from non-broadcasting sources. The record shows that broadcasters compete directly with a plethora of audio and video sources both for audiences and for advertising dollars. *See supra* 32-39. But the Commission structured the Order in a manner that such competition can never be accounted for. As explained above, if 99% of radio broadcasting's listening base moves to streaming platforms like Apple Music, Spotify, and Amazon Music, the Commission would shrug, because radio broadcasting remains "unique" nonetheless. And if advertisers shift their spending nearly entirely away from television broadcasting in favor of other video sources, that would likewise be of no moment due to the uniqueness of television broadcasting. That is not only arbitrary and capricious, it defies common sense.

In propping up uniqueness as the factor that defines radio and television stations as their own respective separate markets, the Commission committed a critical error. Competition can exist among heterogeneous competitors that offer "unique" services; indeed, differentiation is a common feature among fierce competitors. The "unique" features of television or radio broadcasting only matter if they are so special that they insulate those stations from other competitors. Those features

purportedly setting apart radio and television broadcast stations, however, do not provide such a competitive bulwark. Reams of record evidence establish that broadcast stations face extraordinary competitive pressures from digital platforms and others. The Order therefore not only fails to consider the evidence, but it uses the wrong analytical framework for considering the evidence in the first place.

### C. The Order's Citation Of DOJ Antitrust Practice Is Misplaced.

In defense of its anachronistic market definitions, the Order seeks support in antitrust analysis from the Department of Justice. ¶¶ 34, 76 (App.__, __). The cherry-picked statements from lawsuits in an entirely different context (and several prior to the FCC even launching this proceeding)—lawsuits to restrain allegedly anticompetitive behavior—are irrelevant to a proper analysis of the relevant market for the broadcast ownership rules.[8] Indeed, the Commission conceded that the DOJ's antitrust analysis does not consider competition for audience share. Order ¶ 76 (App.__). It is arbitrary and capricious for an agency to rely on irrelevant authorities to sustain its action. *See, e.g.*, *W. Watersheds Project*, 69 F.4th at 716 (reliance on flawed opinion from Fish and Wildlife Service was arbitrary and capricious).

---

[8] For example, the Commission relied on statements in DOJ and FTC actions against Google and Facebook. Order ¶ 76 (App.__). But Google and Facebook's statements are not authoritative on the question of whether advertisers consider them to be substitutable with local radio.

**III.    The Order Failed To Justify Its Retention (And Tightening) Of The Local Radio And Television Rules And Ignored Substantial Record Evidence.**

In addition to violating the plain terms of Section 202(h) and adopting an arbitrary and capricious view of the sources of competition for broadcasters, the Order wholly fails to support leaving the Local Radio Rule unchanged and maintaining key aspects of and indeed tightening the Local Television Rule.  With respect to the Local Television Rule, the Commission specifically failed to justify both of its overbroad *per se* bans—the Top-Four Prohibition and the Two-Station Limit—applicable in all 210 local television markets.   Across the board, the Commission "failed to provide a reasoned explanation for brushing off record evidence."  *Env't Health Tr. v. FCC*, 9 F.4th 893, 908-09 (D.C. Cir. 2021).

**A.    The Order Fails To Justify Retaining The Local Television Rule's Top-Four Prohibition.**

The Order preserved the "Top-Four Prohibition," a blanket ban on combining any two television stations both "ranked in the top four in audience share in a [geographic] market." ¶ 67 (App.__).  Again in a defensive posture, the Commission failed to explain why a *per se* ban remains necessary in any form.  But even if the Commission believes it is necessary in certain circumstances, the Order nonetheless presents a false choice:  either preserve the Top-Four Prohibition in *all* markets or remove it in *all* markets.  That defensive and false binary led the Commission to rely on an outdated and overly-simplistic understanding of the dynamics in local

television markets. The record shows that the Commission's magical dividing line is illusory because it ignored that the drop off between fourth and fifth ranked stations has disappeared in most markets and, moreover, significant variability exists across geographic markets in how market share is distributed *within* the top-four ranked stations. The existence of "Big-Four" English-language broadcast networks (ABC, CBS, Fox, and NBC) and a rarely used waiver process cannot save the Commission's faulty analysis.

### 1.    *The Record Does Not Support an Across-the-Board Demarcation between the Fourth and Fifth Stations.*

In its 2016 Order in the unlawfully merged 2010/2014 quadrennial, the Commission concluded that participants "did not rebut the evidence that a cushion still exists between the fourth-and-fifth-ranked stations in most markets." 2016 Order, ¶ 43 (App.__). In the 2018 NPRM, the Commission then asked whether that dynamic holds true. NPRM ¶ 59 (App.__). NAB answered the call. It commissioned a study from BIA Advisory Services to specifically examine whether there is a consistent drop off between the fourth and fifth ranked stations in most markets. NAB Comments, Attachment B (App.__-__) (*The Economic Irrationality of the Top-4 Restriction* (Mar. 15, 2019) ("BIA Television Study")). The findings were unambiguous. The BIA Television Study conclusively demonstrated that, in geographic markets with at least five full-power commercial stations, the largest audience share gaps *in two-thirds of those markets* were between the first and second

ranked, the second and third ranked, or the third and fourth ranked stations. *Id.* The largest gap was *not*—as the Commission would have it—between the fourth and fifth ranked stations. *See id.* 32-33 (App.__-__).

The Commission nevertheless claimed that "top-four combinations would often result in a single entity obtaining a significantly larger market share than other entities." Order ¶ 86 (App.__). But that bald assertion rests on a flawed assumption about the division of audience share in various geographic markets. The Commission erroneously assumed that all the top-four ranked stations in a given market account for roughly the same share of viewership and advertising revenue. The record disproves that theory. The same BIA Television Study illustrated that, in many markets, especially mid-sized and smaller ones, the top-ranked station far outstrips all other television stations. BIA Television Study 19-22 (App.__-__). In those markets, a combination of the third and fourth ranked stations, for example, would still not result in market share that reaches the market share of the top-ranked station. The Commission never mentioned BIA's study, thereby ignoring the reality that, in many markets, a combination of top-four stations would *enhance* competition. The Commission thus "failed to consider… important aspects of the problem." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1112-13 (D.C. Cir. 2019).

The Commission also ignored BIA data establishing that smaller markets have a greater need to achieve economies of scale through consolidation. The average

television station in the top ten local markets garners advertising revenue more than twelve times greater than the average station in the 60 smallest markets.  NAB *Ex Parte* Attachment F (Mar. 8, 2023) (App.__).  The Commission disregarded the possibility of relaxing its broadcast ownership rules in those smaller markets, even if it erroneously maintains the rules in large markets.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28-29 (2020).

## 2.   *Combinations among the Top Four Enhance Programming.*

Unable to point to record evidence supporting that its historical rationale for the Top-Four Prohibition remains valid, the Commission instead offered two other related rationales:  "top-four ranked stations are … the most likely stations to originate local news," and combinations would "reduce[] incentives for local stations to improve their programming."  Order ¶ 86 (App.__).  Those conclusions are pure speculation.

The sources cited by the Commission for the proposition that the top-four stations are the most likely to originate local news do not support it.  Order ¶ 86 n.286 (App.__).  The *2022 Communications Marketplace Report* merely reported the number of stations that aired and produced local news.  *See* ¶ 269, 37 FCC Rcd at 15678.  The cited comment letter referred only to the importance of broadcast stations' coverage of local news.  LCCHR Refresh Reply Comments 3-4 (Sept. 30, 2021) (App.__-__).  Finally, the Commission pointed to its ownership rule review

order from 2003, but a twenty-one-year-old finding cannot support the rule's retention now.

The Commission similarly ignored its own precedent and empirical evidence in the record demonstrating that station combinations *enhance* programming. *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003) (agencies "must respond to those comments which, if true, would require a change in the proposed rule.") (cleaned up). Multiple unrefuted studies found that merged stations *increase* their overall viewership and local news programming. NAB Refresh Comments 31 (App.__) (citing *Effects of Deregulation and Consolidation of the Broadcast Television Industry*, 106 American Economic Review 2185 (2016)); *see also id.* at 94 n.325 (App.__); NAB Refresh Reply Comments 34-35 (Oct. 1, 2021) (App.__-__) (citing earlier studies, including ones conducted by the Commission). In its 2017 Order, the Commission noted that common ownership of stations enables them to "provide more high-quality local programming," including costly-to-produce local news, especially in "revenue-scarce small and mid-sized markets." ¶ 77, 32 FCC Rcd at 9836, 9818. Indeed, the Third Circuit earlier observed that common ownership "translated into improved local news and public interest programming" and "generally improved audience ratings." *Prometheus I*, 373 F.3d at 415.

This correlation between local scale and improvements in local programming makes sense. Commercial television broadcasters are for-profit businesses and would continue competing for viewers and corresponding advertising dollars even after combining with another station. Indeed, broadcasters attempt to distinguish themselves from competitors by offering local programming, especially news. *2022 Communications Marketplace Report* ¶ 273, 37 FCC Rcd at 15679. The Commission, on the other hand, completely failed to explain how combinations reduce stations' incentives to improve programming and thus revenues.

> ### 3. *The Existence of Four Major Networks Does Not Justify Retaining the Top-Four Prohibition.*

The Commission further claimed that the Top-Four Prohibition is justified because "there are still four major broadcast networks" and "the programming from these networks continues to be the most highly rated." Order ¶ 86 (App.___). While the top-four *stations* are often affiliated with the "Big-Four" English-language *networks*, the connection in any given geographic market is not always clear cut. For example, stations affiliated with Spanish-language networks rank among the top four in twenty-two local markets. NAB *Ex Parte* 4 (Dec. 13, 2023) (App.___). The Commission cited no evidence to support the connection between the Big-Four Networks and the Top-Four Prohibition, instead pointing to its justifications for retaining the separate national ban on combinations among Big-Four networks. *See* Order ¶ 86 n.286 (App.___). Moreover, the Commission conveniently overlooked

the inevitable implication of its reliance on the connection between the Big-Four networks and the Top-Four Prohibition: if the *national* networks with their *national* programming are the most important predictor of "the ability to attract mass audiences … in *local* television markets," *id.* ¶ 86 (App.__) (emphasis added), then the local markets merge into the national market.  The Commission cannot have it both ways.  *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 777 (D.C. Cir. 2016) (Williams, J., concurring in part) ("the Commission's difficulty, in its mentions of competition, lies in its attempts to have it both ways.").

In any event, the Commission's reliance on the Big Four's programming is misplaced.  As explained above, the video marketplace has changed dramatically in just the past few years.  *All television broadcasting* (not just the Big Four) accounts for only about 20% of total television usage.  NAB *Ex Parte* (Nov. 6, 2023) (attaching Nielsen, *The Gauge* (July 2023)) (App.__-__).  Digital platforms now lead, accounting for nearly 39% of television usage.  *Id.*  It was true in the distant past that the Big-Four networks dominated viewership.  But the Commission refused to grapple with the significant decreases in broadcast television viewership and the corresponding rise of digital services like Netflix and Hulu.

### 4. *The Availability of Waivers Is Illusory.*

Finally, apparently realizing that its current rule is undermined by the extensive record evidence, the Commission sought to muddy the waters by recasting

its blanket Top-Four Prohibition as really a "case-by-case approach." *See* Order ¶ 89 (App.__). To be clear, the FCC does not employ a case-by-case approach, and its attempt to save its arbitrary and capricious rules by magically transforming a *per se* rule into one based on individual facts and circumstances is specious. The Top-Four Prohibition means what it says—no station group can own two of the top-four ranked stations in a market. Period.

The Commission does allow entities to apply for a "waiver" of the Top-Four Prohibition for a particular transaction. But *any* entity can apply for a waiver of *any* Commission rule. *See* 47 CFR § 1.3. That does not mean that all Commission rules are "case-by-case." And in reality, the waiver process for the Top-Four Prohibition is a paper tiger, as very few waivers are actually granted. NAB Comments 70 n.269 (App.__).[9] Tellingly, the Commission referred to the "Top-Four *Prohibition*" multiple times throughout the Order. *E.g.* Order ¶ 69 (App.__). That is no Freudian Slip.

Even if waivers were granted more freely, that ad-hoc approach ignores an obvious practical reality: inherent uncertainty would dissuade broadcasters from pursuing such a transaction, much less executing a deal. *See* NAB Comments 70

---

[9] Petitioners are aware of only one case-by-case exemption granted during the current Chair's tenure, and it merely allowed continuance of an existing top-four combination. *See* Order, LMS File Nos. 0000238010, 0000238009, 0000238018 (June 18, 2024).

n.269 (App.___) (explaining that few broadcasters apply for waivers since they are rarely granted). A station owner would hardly spend the time and resources needed to acquire a station only in hopes that the Commission *might possibly* exercise its perennially unused discretion to issue a waiver in that case.

Far from a panacea for overbreadth of the Top-Four Prohibition, the waiver process is a dog with no bite. The Order retained an overbroad rule that bans all combinations among the top-four stations in all markets. Suddenly calling it a "case-by-case" approach does nothing to blunt its force. That is not reasoned decision-making.

### B. The Commission Failed To Justify Its Two-Station Limit.

The Commission's Order also retained its *per se* limitation on owning more than "two stations in a local market." Order ¶ 82 (App.___). In doing so, it repeated many of the same errors it committed with respect to the Top-Four Prohibition.

As an initial matter, the Commission created another false choice. Once again taking a defensive posture, the Commission sought to fend off suggestions to raise the limit from two stations to three in *all* markets. *See id.* ¶ 83 (App.___) ("We do not find adequate support, however, for the notion that allowing ownership of a third station would generate public interest benefits outweighing potential public interest harms."). That cursory analysis entirely ignored the possibility that the Two-Station Limit is unwarranted in *certain* geographic markets, particularly given the

substantial variability between markets across the country.  *See Motor Vehicle Ass'n*, 463 U.S. at 50-51 (agencies must consider reasonable alternatives).  Nowhere did the Commission explain why two is the right number in markets as different as New York City and Hermann, Missouri or Glendive, Montana.  *See* NAB Refresh Comments 98 (App.__).  In the same vein, the Commission ignored unrebutted empirical evidence demonstrating huge economic disparities between stations in big and small markets.  *See, e.g.*, NAB *Ex Parte* 49 & Attachment F (Mar. 8, 2023) (App.__, __-__); NAB Refresh Comments 33-34 & Attachment D (App.__-__).

More broadly, the Commission never explained why the Two-Station Limit is still warranted *anywhere*.  Its brief discussion—which expressly relied on its faulty determination that broadcast television stations only compete with each other— did not even try to demonstrate that the restriction is still necessary.  Order ¶ 83 (App.__).  The Commission's failure to attempt to establish that the Two-Station Limit remains necessary in the public interest as a result of competition in all geographic markets violates both Section 202(h) and the APA.  *See W. Watersheds Project*, 69 F.4th at 704-05.

## C.  The Order's Abrupt Change To Note 11 Of The Local Television Rule Is Likewise Unjustified.

The Order's revision to Note 11 is similarly unreasoned.

The Commission adopted Note 11 in the 2016 Order to prohibit a limited range of network-affiliation swaps that it believed were the functional equivalent of

station transfers that resulted in common ownership of two top-four rated full-power stations. 31 FCC Rcd at 10028 (Appendix A). In doing so, the Commission expressly declined to include multicasting. The 2024 Order does an about-face, expanding at cable and satellite television's requests the Top-Four Prohibition to now restrict low-power television station ownership, as well as a station's ability to offer multiple top-four ranked channels on the same station. Order ¶ 97 (App.___).

The Commission failed to adequately consider the benefits of airing popular network programming on a multicast stream or via a low-power station. In particular, in "short" markets—geographic areas with fewer than four full-power commercial television stations—consumers do not have access to one of the major networks unless a broadcaster airs the missing network on either its full-power station's multicast stream or on a low-power station. In other words, in such markets, unless a full-power station owner puts a second top-four ranked station on its multicast or pairs it with a low-power television station in the same market, viewers in those markets simply will not have access to one or more of the Big-Four English-language networks. In making this major policy change—and one that could significantly hobble consumers—the Commission did not even try to determine how many markets are short. To turn this blind eye meant ignoring direct record evidence showing that a quarter of all television markets face this problem. NAB Refresh Reply Comments 53-54 (App.___-___). That failure to adequately

consider a significant aspect of the problem is arbitrary and capricious. *Motor Vehicle Ass'n*, 463 U.S. at 43.

Moreover, the Commission's adversarial approach to low-power stations and multicasting is a marked and unaccounted for reversal of agency policy. The Commission has never before subjected low-power television stations or multicasting to its ownership rules. Indeed, in prior proceedings, the Commission stressed the importance of low-power stations and multicasting in ensuring that communities can access all major television networks. *See, e.g.*, 2016 Order ¶ 72, 31 FCC Rcd at 9892-93. The Commission also expressly distinguished multicasting from ownership of multiple stations. *In the Matter of 2014 Quadrennial Regulatory Review*, 2014 NPRM ¶ 68, 29 FCC Rcd 4371, 4399 (Apr. 15, 2014). Because multicasting does not generate the same cost savings and revenue increases associated with acquiring a second station, multicasting is "not a substitute for common ownership of multiple stations." *Id.* ¶ 39, 29 FCC Rcd at 4388.

When an agency changes its position, it must acknowledge the change and explain how the change is justified. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 524 (2009). Here, the Commission did not adequately explain why its view has changed. The Commission conceded that multicasting continues to bring network programming to smaller geographic areas, but then in the very next breath tightened Note 11 to obstruct broadcasters from doing just that. Order ¶ 107

(App.__).  That is an additional reason the changes to Note 11 are arbitrary and capricious.

The Commission also turned a blind eye to readily available data on the public interest benefits of top-four rated programming on low-power stations and multicast streams.  NAB and others described the benefits in detail.  *See, e.g.*, NAB Refresh Comments 99-106 (App.__); Nexstar Refresh Reply Comments 12-16 (Oct. 1, 2021) (App.__-__).  The Commission could have analyzed whether competition in short markets has suffered due to the combinations in question.  This did not have to be a hypothetical exercise.  But instead of bothering to examine real-world markets where these arrangements exist, it effectively prohibited them.

### D.  The Order Fails To Adequately Justify Retention Of The Local Radio Rule.

The current version of the Local Radio Rule remains largely unchanged since 1996.  The Order again leaves the rule in place despite obvious and foundational shifts in the audio market.  As explained above, the Commission's refusal to make so much as the slightest adjustment to the Local Radio Rule in light of tremendous competition violates Section 202(h)'s deregulatory command.  That action is independently arbitrary and capricious given the record evidence supporting deregulation, and the Order omits even a perfunctory explanation for retaining the rule's specific geographic market caps and AM/FM subcaps.  The Commission also ignored uncontroverted evidence showcasing the value that relaxed ownership

limitations would bring to radio broadcasters and their audiences.  *See ABL* , 25 F.3d at 646 (8th Cir. 1994) (agency's failure to consider record evidence violated APA); *see also Nat'l Lifeline*, 921 F.3d at 1113-14.

### 1. *The Commission Failed to Justify Retaining the Local Radio Rule, Including the Geographic Market Caps.*

The Commission's take-it-or-leave-it mentality permeates the Order's radio section.  Fundamentally misconceiving its job under Section 202(h), the Commission blocked proposals to relax the rule's numerical limitations, but offered no justifications for why the lines drawn years ago remain necessary in the public interest as the result of competition.

**Overall numerical limits.**  The Commission made no attempt whatsoever to justify its current caps or adjust the tiers to which they apply (eight stations in a geographic market with 45 or more stations; seven stations in a geographic market with 30-44 stations, etc.).  The Commission concluded that "the current tiers and limits maintain an appropriate level of competition."  Order ¶ 42 (App.__).  But one searches in vain for any explanation for why any of the specific limits are appropriate.  For example, the Commission did not explain why eight stations is the appropriate limitation for broadcasters in the Chicago market (with over 130 radio stations) and for broadcasters in the Kansas City market (with only 45 stations).[10]

---

[10] BIA maintains detailed information about the count of radio stations across markets.

Nor did it explain why the public interest would be disserved by allowing an entity to own eight stations in a geographic market with 30-44 stations instead of the current limit of seven.

Rather than conducting the rigorous public interest analysis required by Section 202(h), the Commission treated the task as simply finding reasons to reject proposals made by commenters. *See* Order ¶ 41-43 (App.__-__). Even if the Commission disagreed with particular proposals in the record, it still must affirmatively justify the specific limitations on radio station ownership it decides to retain.

Similarly, the Commission made no effort to account for the acute problems faced by radio broadcasters in smaller geographic markets. Radio stations in small and mid-sized markets earn, on average, a mere fraction of the revenues earned by the average station in the top-ten geographic markets, and many earn truly miniscule amounts. For example, in the smallest markets as ranked by Nielsen based on population, the average station brought in less than $350,000 in *revenue* in both 2020 and 2021. NAB Refresh Comments 33 & Attachment C (App.__); NAB *Ex Parte* 27 & Attachment B (Mar. 8, 2023) (App.__,__). These minimal revenues represented just 7.6 and 7.5%, respectively, of the revenues garnered by the average station in the ten largest markets. *Id.* The record is replete with evidence demonstrating that many stations in smaller geographic markets struggle to cover

their fixed operating costs. *See, e.g.*, BIA Radio Study 31-34 (App.__-__). Owners of struggling stations in smaller markets are "trapped" and cannot sell their stations "because the logical and best buyer[s]"—owners of other stations—are prohibited from purchasing them. Connoisseur Comments, Exh. C (declaration of W. Lawrence Patrick) (App.__-__); BIA Radio Study i-ii, 1-3, 20-36 (App.__-__, __-__, __-__).

The Commission's across-the-board caps on ownership did not consider the gaping disparities in the number of stations, the advertising base, and other factors differentiating geographic markets. Liberalizing the rules on station combinations is more desperately needed in certain markets, but the Commission refused to engage with that alternative altogether—which constitutes arbitrary and capricious agency action. *See Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 295-96 (8th Cir. 1985).

**FM and AM subcaps.** The Local Radio Rule also contains specific restrictions on the number of radio stations that an entity may own within the AM or FM service. Remarkably, the Commission barely attempted to justify maintaining the subcaps. *See* Order ¶¶ 54-55 (App.__-__). For example, the Order entirely ignores record evidence illustrating that, given the AM service's particular struggles to compete, relief from the Local Radio Rule is especially necessary. As BIA found, AM radio's struggles warrant eliminating all limits on ownership. BIA Radio Study 15-18 (App.__-__). Indeed, AM radio stations' share of advertising revenue is

disproportionately small—collectively less than 5% of radio advertising revenue in many Nielsen markets. *Id.* To incentivize AM radio's revitalization, broadcasters must be permitted to own larger numbers of AM stations, which increases revenue and diffuses costs among more stations. The Commission also ignored the possibility of eliminating the subcaps in particular markets. *See Menorah Med. Ctr.*, 768 F.2d at 295-96 (vacating agency rule because agency failed to "discuss" alternatives to its preferred rule).

Additionally, the Commission's reasoning for retaining the restrictions is internally inconsistent. The Commission first argued that it was necessary to retain the FM subcap because otherwise broadcasters would abandon the comparatively weaker AM service. Order ¶ 55 (App.__-__). But in the very next paragraph, the Commission contended that it must retain the AM subcap because otherwise AM stations will become "targets for acquisition" in light of their relative strength. *Id.* ¶ 56 (App.__). Subcaps cannot be justified both because the AM service is alarmingly weak, and also because its strength will lead to excessive concentration. The Commission's disregard of reliable evidence and attempt to "have it both ways" are, once again, arbitrary and capricious. *Chamber of Comm. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023).

## 2. The Commission Ignored Substantial Evidence that Combinations Will Enable Beneficial Economies of Scale.

Among the most disconcerting omissions in the Order is the near-complete failure to acknowledge broadcast radio's struggles, as well as the financial relief that relaxing ownership restrictions would bring to radio broadcasters.

The Commission first distorted the record evidence showing massive declines in revenue for radio broadcasters. The Commission carefully erased portions of the evidentiary picture, contending that radio advertising revenue was "virtually flat from 2010 to 2019" and pointing out that the COVID-19 pandemic contributed to reduced revenues. Order ¶ 44 (App.___) (citing *2022 Communications Marketplace Report* ¶ 303, 37 FCC Rcd at 15692). But focusing on the 2010s ignores that the *same* paragraph of the *Marketplace Report* found that radio revenue "never fully recovered" from the 2008 financial crisis and that radio revenues, even before the COVID-related decline, remained billions below the industry's revenues in 2005-2007. *2022 Communications Marketplace Report* ¶ 303, 37 FCC Rcd at 15692. The Commission omitted the years inconvenient to its hypothesis. When a fuller timeframe is considered, the data is unambiguous: even when revenue from digital advertising is included, nominal radio revenues (i.e., unadjusted for inflation) fell 39.8% from 2005 to 2020. NAB Refresh Comments 77 n.252 (App.___).

The Commission compounded that error by ignoring uncontroverted record evidence documenting the benefits that consolidation can yield for broadcasters. For

instance, BIA found that radio stations have significant fixed costs, and that loosening the current caps would allow them to spread costs and increase their cash flows. *See* BIA Radio Study 27-33 (App.__-__). That study also considered the effects of consolidation on revenue. It found that owners of larger local FM clusters more effectively convert listenership into revenue, as compared to those owning smaller collections of FM stations. BIA Radio Study 31, 37-39 (App.__, __-__). BIA concluded that, if permitted to combine more freely, stations would experience substantial cash flow and likely revenue increases. *Id.* at 26-31 (App.__-__).

The Commission did not even cite that extensive BIA study, much less assess its findings. The Commission likewise trivialized the first-hand experiences of broadcasters that corroborate the study's findings. *See, e.g.*, Connoisseur Comments 22-23 & Exh. C (declarations) (App.__-__, __-__); American General Media Reply Comments 18 (May 29, 2019) (App.__). Instead, it deferred completely to the contrary assertions of iHeartRadio, *see, e.g.*, Order ¶ 45 n.151 (App.__), which states, without supporting evidence, that acquiring more stations would have a minimal effect on advertising revenue. *See* iHeart Reply Comments 11-12, 19-23 (May 29, 2019) (App.__-__, __-__).

The Commission's credibility determination is astounding. It completely ignored a robust study conducted by BIA, an organization the Commission recognized in a subsequent radio-related proceeding as having "38 years of

experience in the broadcast industry." *Report and Order and Further NPRM*,
MB Docket No. 20-401, FCC 24-35, at 21 n.132 (Apr. 2, 2024).  Then it disregarded
the first-hand experiences of broadcasters documenting how the ownership
restrictions impede their ability to compete against behemoth (and largely
unregulated) digital platforms.  Instead, the Order curiously acquiesces to conclusory
assertions made by the largest radio broadcaster in the country—which also operates
a streaming service making its stations available to anyone with an Internet
connection—without acknowledging its position as the "national industry
incumbent," whose "commercial dominance in the radio marketplace would be hurt
by elimination of the rule."  Order at 94 (App.__) (Dissenting Statement of
Commissioner Simington).  The Commission did not explain its choice to credit this
one company's assertions while also ignoring conflicting evidence from other
broadcasters.  *See, e.g.*, NAB *Ex Parte* (Feb. 16, 2022) (App.__); *see also Friends
of Buckingham v. State Air Pollution Bd.*, 947 F.3d 68, 87-90 (4th Cir. 2020) (agency
failed to explain its resolution of "conflicting evidence").

## IV.     The Order Is Unlawful For Additional Reasons.

If any doubt remains about the legality of the Local Television and Radio
Rules, close review crystallizes that retaining the rules as currently constituted would
actually undermine the Commission's stated goals of competition, localism, and

viewpoint diversity. Moreover, the revision to Note 11 contravenes the Communications Act (including 47 U.S.C. § 326) and the First Amendment, to boot.

## A. Retaining The Local Television and Radio Rules Undermines The Commission's Stated Goals.

Over twenty years ago, the D.C. Circuit held that a Commission decision to retain an ownership rule was arbitrary and capricious because the Commission failed to "provide an adequate basis for believing the Rule would in fact further" the agency's stated goal. *Fox I*, 280 F.3d at 1043. The Commission has repeated that mistake, and separately failed to explain its reversal of position on viewpoint diversity.

**Competition.** The record here provides no support for the suggestion that broadcasters have undue market power or that the Local Television and Radio Rules are necessary to enhance competition. Similarly, in *Fox I*, the D.C. Circuit considered challenges to the FCC's decision not to repeal or modify the national television station ownership rule, which then limited common ownership of stations reaching over 35% of U.S. television households. 280 F.3d at 1034. The Commission justified retaining the rule on the basis that it promoted competition. That justification did not hold up under scrutiny because the Commission had "no evidence that broadcasters have undue market power, such as to dampen competition, in any relevant market." *Id.* at 1041.

If anything, broadcasters' market power two decades later is significantly reduced. *See supra* 32-38. Moreover, the existing ownership rules prevent broadcasters from accessing economies of scale that would allow them to better compete with new entrants in the video and audio marketplace. *See supra* 44-47.

**Localism**. The Order similarly undermines the FCC's asserted interest in promoting localism. The record contains considerable evidence that competition from *non*-broadcasting sources catalyzes local programming. As noted above, local programming is one of the few areas where broadcasters may have a competitive advantage over services like Hulu and Netflix. Multiple studies have shown that permitting combinations actually *increases* and *improves* local programming content, because consolidation creates cost-savings, which can be reinvested into local programming. *See, e.g.*, NAB Refresh Reply Comments 32-36 (App.__-__); NAB Refresh Comments 94-95 n.325 (App.__-__). The Commission provided no "valid reason to think the [current ownership] Rule[s] [are] necessary to safeguard competition" and localism. *Fox I*, 280 F.3d at 1042.

**Viewpoint Diversity.** The Commission claimed that retaining both the Local Television and Local Radio Rules is necessary to protect viewpoint diversity, Order ¶¶ 46, 81 (App.__,__), contrary to its prior position that neither rule promotes viewpoint diversity, *see, e.g.*, 2017 Order ¶¶ 57, 76, 32 FCC Rcd at 9827, 9835. The

Commission did not provide a "reasoned explanation for its" reversal for either rule. *See FCC v. Fox*, 556 U.S. at 515-16.

To begin, the Commission did not even *acknowledge* its longstanding position that "radio stations are not a primary source of viewpoint diversity in local markets." 2017 Order ¶ 57, 32 FCC Rcd at 9827. That is a blackletter APA violation. *FCC v. Fox*, 556 U.S. at 515. In any event, the Commission cited just two comments postulating that consolidation could reduce some types of program formats, while completely ignoring decades' worth of studies showing that consolidation leads to greater programming diversity. NAB Reply Comments 45-48 (App.__-__). Disregarding significant record evidence is arbitrary and capricious. *Env't Health Tr.*, 9 F.4th at 908-09.

With respect to the Local Television Rule, the Commission at least recognized its change in position. Order ¶ 81 (App.__). But unsurprisingly, the Commission completely ignored multiple other studies, including empirical studies the Commission itself authorized, showing that consolidation *increased* viewpoint diversity on television or, at worst, had no effect. NAB Refresh Reply Comments 24-25 n.66 (App.__-__); NAB Comments 68 n.262 (App.__). In fact, the only support the Commission cited are two "*theoretical analyses* on how the presence of more independently owned outlets can increase viewpoint diversity." Order ¶ 81 n.279 (App.__) (emphasis added). The Commission's slipshod treatment of record

evidence is—again—arbitrary and capricious. *Envt'l Health Trust*, 9 F.4th at 908-09.

### B. The Order's Revisions To Note 11 Contravene The Communications Act And The First Amendment.

As explained above, the Commission's revision of Note 11 violates Section 202(h) because it prohibits tightening the broadcast ownership rules, and, separately, because the Commission failed to adequately justify its change in position. *See supra* 21-24, 51-54. The Note 11 revision is also unlawful because the Commission may not regulate broadcasters' programming choices—the Communications Act does not authorize it, and the First Amendment forbids it.

*First*, the Communications Act does not authorize rules implicating program content. *See, e.g.*, NAB Refresh Reply Comments 60-61 (App.__-__). The D.C. Circuit in *Motion Picture Association v. FCC* explained that "Congress has been scrupulously clear when it intends to delegate authority to the FCC to address areas significantly implicating program content." 309 F.3d 796, 805 (D.C. Cir. 2002). The court concluded that the authorities provided by Sections 1, 4(i) and 303(r) of the Communications Act did not authorize the Commission to mandate video descriptions for television programming.

The Commission also relied on Sections 1, 4(i) and 303(r) for its authority to issue broadcast ownership rules. *See* Order ¶ 153 (App.__). However, the revision to Note 11 empowers the Commission to control broadcasters' particular

programming choices. Further, Note 11 applies only to certain speakers—those entities airing programming on multiple programming streams or on a second, low-power station. In other words, an entity is free to air programming on a multicast stream or on a second, low-power station in the given geographic market *so long as that programming is not likely to be popular*, which generally means that "Big-Four" networks cannot be aired via multicasting or by commonly-owned low-power television stations.

Take an example. "Television Company" owns both a top-four rated full-power television station airing NBC programming and a low-power television station in the Minneapolis market. To appeal to a broader array of viewers and advertisers, Television Company wants to air different programming on its low-power station. Prior to the 2024 Order, Television Company would have been free to reach agreement with any other network to air that network's shows on its low-power station. But after the 2024 Order, the legality of that arrangement depends on the particular network. Television Company would generally be free from scrutiny if its low-power station affiliated with a secondary network that falls outside of the "top four" in ratings, such as the CW. But if Television Company sought to air programming from another "Big-Four" network, that arrangement would in many cases run afoul of the reimagined Note 11.

The Commission would not just have a say in programming choices when it comes to a second, low-power television station. The new Note 11 covers multicasting as well. When a broadcaster multicasts, that stream comes from the *same* full-power television station with the *same* Commission license. Picking up with the example of Television Company, it would not just be limited in what programming it could air on a second station. Rather, the new Note 11 *also restricts how it can use its single full-power station.* For instance, if Television Company decides to multicast an Asian-language channel or an "oldies" channel like CoziTV—no problem. But multicasting programming from a Big-Four network now will often bring Commission disapproval.

Congress did not authorize the Commission to tell broadcasters what programming they can air on their own stations. Congress would have been pellucidly clear had it wanted to delegate authority to regulate programming content because "such regulations invariably raise First Amendment issues." *Motion Picture Ass'n*, 309 F.3d at 805. The Commission's revision to Note 11 is thus without statutory authorization and must be vacated. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635, 655 (4th Cir. 2018).

Indeed, the Note 11 revision does raise serious First Amendment issues. The Constitution "does not countenance governmental control over the content of messages expressed by private individuals." *Turner Broadcasting Sys., Inc. v. FCC*,

512 U.S. 622, 641 (1994). The Note 11 revision is content-based on its face because it bars airing particular programming by particular speakers in a particular manner; it thus is subject to heightened First Amendment scrutiny. *Barr v. Am. Ass'n of Political Consultants*, 140 S.Ct. 2335, 2346 (2020); *see also Telescope Media Grp. v. Lucero*, 936 F.3d 740, 753 (8th Cir. 2019).[11] Yet the Commission did not even try to explain what the compelling governmental interest is and how its rules are narrowly tailored. Moreover, because the Commission has no authority to interfere with broadcasters' free speech rights, the revision to Note 11 constitutes "impermissible government censorship" in violation of Section 326 of the Communications Act. *Office of Cmmc'n of United Church of Christ v.* FCC, 707 F.2d 1413, 1428 (D.C. Cir. 1983).

At minimum, the Order should be vacated because the Commission "failed even to acknowledge, let alone respond to, comments" concerning its statutory authority to regulate programming, including comments specifically identifying *Motion Picture Association*, and similarly barely acknowledged (in a footnote) the serious First Amendment issues. *See* NAB Refresh Reply Comments 60-61

---

[11] The Order states that the Commission's additions to Note 11 consider only "market concentration." ¶ 105 (App.__). To the contrary, the Commission elsewhere relies on the close association between the top-four stations and the top-four networks. *Id.* ¶ 86 (App.__).

(App.\_\_-\_\_); NAB *Ex Parte* (Oct. 30, 2023) (App.\_\_).  That short shrift violates the APA.  *See, e.g.*, *Env't Health Tr.*, 9 F. 4th at 909.

## V.    The Court Should Vacate The Local Television and Local Radio Rules.

The presumptive remedy here is vacatur: "The reviewing court *shall …* hold unlawful and set aside agency action" found to be unlawful under the APA.  5 U.S.C. § 706(2); *see also Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1114 (5th Cir. 2024) (vacating final rule); *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated'") (citation omitted).  Moreover, as explained above, the Commission has been dilatory in its initiation of and completion of quadrennial reviews.  In fact, the Commission *never completed the 2010 review*, instead unlawfully merging it with the 2014 proceeding.  Accordingly, a remand to the Commission for a new proceeding (that it would likely merge with the already-initiated 2022 proceeding) would not provide the relief that the statute requires or broadcasters desperately need.

For those reasons, this Court should vacate: (1) Local Television Rule in its entirety, including Note 11; and (2) the Local Radio Rule in its entirety, including the AM/FM subcaps.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court (1) grant the consolidated Petitions; and (2) vacate the Local Television Rule, including Note 11; (3) vacate the Local Radio Rule, including the AM/FM subcaps.

Dated: July 15, 2024

Respectfully submitted,

 _/s/ Helgi C. Walker_____
Helgi C. Walker
 *Counsel of Record*
Andrew G.I. Kilberg
Cameron J.E. Pritchett
Hadhy Ayaz
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

Barbara A. Smith
BCLP LLP
3600 One Metropolitan Square
211 N. Broadway
Saint Louis, Mo 63102-2186
(314) 259-2367
barbara.smith@bclplaw.com

*Counsel for Petitioner Zimmer Radio
of Mid-Missouri, Inc.*

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, S.E.
Washington, D.C. 20003
Telephone: (202) 429-5430
rkaplan@nab.org

Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
ajohnson@gibsondunn.com

*Counsel for Petitioner Nexstar Media
Group, Inc.*

*Counsel for Petitioner National
Association of Broadcasters*

Eric D. Stolze
Stephen B. Kinnaird
PAUL HASTINGS LLP
1170 Peachtree Street, N.E.
Suite 100
Atlanta, GA 30309
(404) 815-2315
ericstolze@paulhastings.com

*Counsel for Petitioners Beasley Group,
LLC* and *Tri-State Communications,
Inc.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 14,991 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point, Times New Roman font using Microsoft  Word for Microsoft Office 365 Version 2404.

3.      I further certify that this brief has been scanned for viruses and is virus-free.

Dated:  July 15, 2024                     _____
                                                              */s/ Helgi C. Walker*
                                                               Helgi C. Walker

## CERTIFICATE OF SERVICE

I hereby certify that, on July 15, 2024, I caused the foregoing brief to be electronically filed and served on all counsel of record via this Court's CM/ECF system.

*/s/ Helgi C. Walker*
Helgi C. Walker